**STINNETT'S PONTIAC SERVICE, INC., Richard W. Stinnett and Gay P. Stinnett, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.**

No. 82–6172.

United States Court of Appeals, Eleventh Circuit.

April 20, 1984.

Malcolm Lewis Kneale, Miami, Fla., for petitioners.

Kenneth W. Gideon, Chief Counsel, George M. Sellinger, Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Section, Thomas A. Gick, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before HILL and HATCHETT, Circuit Judges, and ALLGOOD *, District Judge.

HATCHETT, Circuit Judge:

In this case, we review the Tax Court's holdings regarding the tax consequences of transactions involving two corporations and their common shareholder, the taxpayer. We affirm.

### Facts

Richard W. Stinnett is president of Pontiac, an automobile dealership, and he owns 74% of the stock in the company.[1] In the early 1960's, Pontiac established a qualified profit sharing plan for its employees. Pontiac would calculate its year-end profit, and, if such profit exceeded $25,000, Pontiac would transfer 15% of the compensation paid to each employee-member to the plan. On or about January 1, 1973, Pontiac issued a demand note for $33,500 bearing 8% annual interest, to the profit-sharing plan. At the date of the note's issuance, Pontiac was financially able to contribute cash or a check to the profit-sharing plan.

On or about July 2, 1973, Stinnett, Danford L. Sawyer (Sawyer), and Albert L. Bundy (Bundy) purchased the entire stock of Cargo Construction Company, Ltd. (Cargo), a Bahamian corporation. Cargo's principal business activity was commercial fishing, and its only asset was the lobster boat, R/V Victory. Stinnett owned 43%; Sawyer owned 35%; and Bundy owned 22% of Cargo's stock. Stinnett, Sawyer, and Bundy also purchased the R/V Victory for approximately $55,000. The three shareholders realized that Cargo would need additional capital to satisfy certain unforeseen initial costs and, therefore, agreed to contribute additional capital, in proportion to each shareholder's stock ownership in Cargo, to Cargo to meet its needs.

From 1973 to 1975, Sawyer and Bundy contributed funds to Cargo as required by the shareholders' agreement. Stinnett, however, failed to contribute to Cargo pursuant to the shareholders' agreement. Pontiac, the corporation which Stinnett controlled, contributed funds and boat parts to Cargo. In 1973, Pontiac transferred $12,-969.86 to Cargo, and, in return, Cargo issued interest bearing unsecured demand notes to Pontiac. During this same period, Pontiac also purchased marine parts for Cargo. Although Pontiac usually sold marine parts at 100% markup, it sold the marine parts to Cargo at only a 10% markup. Pontiac also made additional payments of $12,000 to Cargo. Cargo failed to issue any notes to Pontiac for any part of this amount.

From 1974 to 1975, Pontiac transferred an additional $45,000 to Cargo. Pontiac did

---

* Hon. Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Stinnett hereafter refers to Richard W. Stinnett. Gay P. Stinnett is a party to this action because she filed a joint tax return with Richard W. Stinnett in 1974.

not obtain any financial statements from Cargo prior to making any of the transfers, nor were the amounts of the transfers secured. After realizing that Cargo's lobster venture was unsuccessful, the shareholders decided to sell the R/V Victory and recoup their investment. On February 23, 1976, therefore, they agreed to sell the boat for $80,000 with Pontiac receiving $20,000 from the sale. That sale never materialized, but the R/V Victory was eventually sold for $42,000, and Cargo paid Richard Stinnett $6,000 for the sale of the boat.

On its 1974 federal income tax return, pursuant to 26 U.S.C.A. § 166(a) (West 1978), Pontiac deducted $56,388.63 as a partially worthless debt for its advances to Cargo.[2] It computed this amount by subtracting $20,000, the anticipated amount Pontiac would have received from the sale of the R/V Victory, from $76,388.63, the total amount Pontiac claimed it had advanced Cargo. The Commissioner disallowed the partially worthless debt deduction, and determined that the contributions from Pontiac to Cargo constituted constructive dividends to Stinnett in 1973 and 1974. Therefore, these dividends were taxable to Stinnett pursuant to 26 U.S.C.A. §§ 301, 316 (West 1978 & Supp.1983). The Commissioner also disallowed Pontiac's attempt to deduct, pursuant to 26 U.S.C.A. § 404(a) (West 1978 & Supp.1983), the face amount of the promissory note it had issued to its profit-sharing plan.[3] After disallowing the deductions, the Commissioner determined the respective deficiencies.

The tax court affirmed the Commissioner's rulings.

Stinnett's Pontiac Service, Stinnett, and Gay P. Stinnett appeal the United States Tax Court's decision determining a $4,047.52 deficiency in Pontiac's corporate income tax for 1972, and determining deficiencies of $16,012.81 and $36,321.46 in Stinnett's personal income taxes for 1973 and 1974.

Pontiac and Stinnett urge us to reverse the tax court's holding, claiming that Pontiac's advances to Cargo were worthless debts and, therefore, were deductible under 26 U.S.C.A. § 166; and, the advances failed to constitute constructive dividends to Stinnett. Pontiac and Stinnett also contend that the amount of the promissory note it had paid to its profit-sharing plan was deductible under 26 U.S.C.A. § 404(a).

A. Were the Advances From Pontiac to Cargo Deductible as a Worthless Debt, Or Were They a Contribution to Capital?

Title 26 U.S.C.A. § 166(a)(1) (West 1978) provides that a deduction shall be allowed for "any debt which becomes worthless within the taxable year." 26 U.S.C.A. § 166(a)(1). The right to a deduction for a bad debt is limited to a bona fide debt. 26 C.F.R. § 1.166–1(c) (1983). "A gift or contribution to capital shall not be considered a debt for purposes of section 166." 26 C.F.R. § 1.166–1(c) (1983). The tax court determined that the advances from Pontiac to Cargo were contributions

---

**2.** Title 26 U.S.C.A. § 166(a) (West 1978) provides:

§ 166. Bad debts
(a) General rule.—
(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

**3.** Title 26 U.S.C.A. § 404(a) provides, in pertinent part:

§ 404. Deduction for contributions of an employer to an employees' trust or annuity

plan and compensation under a deferred-payment plan
(a) General rule.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year ....

to capital and, therefore, not a bona fide debt for the purposes of 26 U.S.C.A. § 166. The tax court also held that even if the advances constituted bona fide debts, they did not become worthless in 1974; and therefore, Stinnett could not deduct them in 1974.

■ The question of whether the advances from Pontiac to Cargo constitute a loan or a contribution to capital depends on whether the advances are debt (loans) or equity (contributions to capital). In *Estate of Mixon v. United States*, 464 F.2d 394 (5th Cir.1972), the Fifth Circuit detailed the thirteen factors which merit consideration in determining whether advances constitute debt or equity: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *Id.* at 402. *See also In re Indian Lake Estates, Inc.*, 448 F.2d 574, 578–79 (5th Cir.1971); *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir.1969). "The approach of this court has been to consider all the factors and weigh the evidence favoring characterization of the advance as debt or equity, while realizing that the various factors are not of equal significance and that no one factor is controlling." *Estate of Mixon*, 464 F.2d at 402.

### 1. Name Given to the Certificate

■ "The issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness."

*Estate of Mixon*, 464 F.2d at 403. In this case, notes represented only $12,969.86 of the $76,388.63 Pontiac advanced Cargo. The notes were payable on demand and required interest; however, no fixed or final maturity date existed and Cargo never paid interest on the notes. The notes were also unsecured. While the issuance of a note may evidence a bona fide indebtedness, an unsecured note due on demand with no specific maturity date, and no payments is insufficient to evidence a genuine debt. *Tyler v. Tomlinson*, 414 F.2d 844, 849 (5th Cir.1969).

The remaining $63,418.77 was advanced without any indicia of indebtedness. Moreover, Pontiac never attempted to collect this amount despite the fact that a distribution was made to Cargo's shareholders upon liquidation. The lack of any certificate evidencing indebtedness for the majority of the advances and the unsecured note with no specific maturity date tend to show that the advances were equity and not a bona fide debt.

### 2. The Presence or Absence of a Fixed Maturity Date

■ The Fifth Circuit has held that the presence of a definite maturity date and a definite obligation to repay is, "[a] highly significant feature of a debtor-creditor relationship." *Dillin v. United States*, 433 F.2d 1097, 1101 (5th Cir.1970). Indeed, the Fifth Circuit has held that the absence of a fixed maturity date is indicative of an equity advance. *Estate of Mixon*, 464 F.2d at 404. In this case, no fixed date for repayment existed for any of the advances, including the amounts the notes represented. This factor, therefore, strongly indicates that the advances were contribution to capital, and not loans.

### 3. Source of the Payments

■ The importance of the source of the payments, "is that if repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital, but if repayment is not dependent upon earnings, the transaction reflects a loan to the corporation." *Estate of*

*Mixon,* 464 F.2d at 405. *See also Harlan v. United States,* 409 F.2d 904, 909 (5th Cir.1969). In this case, Cargo's only way of repayment was from earnings produced from its operations. Cargo could not repay Pontiac from any non-earnings source, because the only non-earning source available for repayment was the sale of the R/V Victory, a sale inadequate to fulfill Cargo's obligations. Cargo's source of repayment to Pontiac was Cargo's earnings, and this factor tends to show that Pontiac's advances were equity and not debt.

#### 4. Right to Enforce Payment

■ If a fixed obligation to repay the advances exists, the transaction appears to be a loan. *Estate of Mixon,* 464 F.2d at 405; *Campbell v. Carter Foundation Production Co.,* 322 F.2d 827, 831 (5th Cir. 1963). Cargo was not obligated to repay the loans Pontiac advanced to it. The repayment was within the discretion of the parties and was not conditioned upon the occurrence of certain events. This criteria, therefore, also indicates that the advances were contributions to capital and not debt.

#### 5. Participation Increase in Management

If Stinnett's participation in Cargo increased as a result of Pontiac's advances to Cargo, the advances indicate a capital contribution rather than a loan. *Estate of Mixon,* 464 F.2d at 406. Pontiac contends that its advances to Cargo did not increase Stinnett's role in Cargo, but, upon Cargo's liquidation, Stinnett received approximately 55% of the corporation's assets when he was originally entitled to only 43% of the assets. Accordingly, Stinnett's interest in Cargo increased as a direct result of Pontiac's contributions, advanced to satisfy Stinnett's obligation to contribute capital to Cargo.

#### 6. Status of the Contribution in Relation to Regular Corporate Creditors

If Pontiac is subordinated to Cargo's general creditors, a contribution to capital is indicated. *Tomlinson v. 1661 Corporation,* 377 F.2d 291, 297–98 (5th Cir.1967); *United States v. Henderson,* 375 F.2d 36,

40 (5th Cir.), *cert. denied,* 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967); *United States v. Snyder Brothers Company,* 367 F.2d 980, 984–85 (5th Cir.1966), *cert. denied,* 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104 (1967). Cargo repaid its obligations to its other creditors, but failed to pay Pontiac for Pontiac's advances. Pontiac was subordinated to Cargo's general creditors, and this subordination indicates that Pontiac's advances to Cargo were contributions to capital.

#### 7. Intent of the Parties

The intent of the parties is to be considered in determining the debt versus equity question, but "[the] *subjective* intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent." *Estate of Mixon,* 464 F.2d at 407; *Tyler,* 414 F.2d at 849–50. Pontiac and Stinnett intended to make the loan, but the circumstances surrounding the advances indicate a contribution to capital. The loan lacked a fixed maturity date, payment of interest, and a certificate evidencing a majority of the indebtedness. Moreover, subordination to the claims of other creditors existed. To hold that the subjective intent of Pontiac and Stinnett prevails over the parties' objective intent would be "to ignore the plain facts and to elevate form over substance." *Tyler,* 414 F.2d at 850. *See also Tomlinson,* 377 F.2d at 299.

#### 8. "Thin" or Adequate Capitalization

Cargo lacked a capital base. Within three weeks of Cargo's purchase, Stinnett, Sawyer, and Bundy advanced additional contributions to Cargo to meet its expenses. Insufficient capital, therefore, existed to fund Cargo's operations, and this factor indicates a contribution to capital. *Henderson,* 375 F.2d at 40; *Tyler,* 414 F.2d at 848–49.

#### 9. Identity of Interest Between Creditor and Stockholder

■ "If advances are made by stockholders in proportion to their respective stock ownership, an equity capital contribution is indicated." *Estate of Mixon,* 464 F.2d at

409. Stinnett, owned 43% of Cargo's shares, and Pontiac, on Stinnett's behalf, contributed Stinnett's proportionate share to Cargo. Since shareholders' advances in proportion to their ownership indicate a contribution to capital, Pontiac's advances, on Stinnett's behalf, also evidence a contribution to capital. *Tyler*, 414 F.2d at 849; *Tomlinson*, 377 F.2d at 297.

### 10. Source of Interest Payments

"[A] true lender is concerned with interest." *Curry v. United States*, 396 F.2d 630, 634 (5th Cir.), *cert. denied*, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). If the lender does not insist on interest payments, he is, therefore, "interested in the future earnings of the corporation or the increased market value of their interest." *Id.* In this case, no provision existed for the payment of interest on the $63,418.77 in advances. Moreover, while the funds advanced on the notes required interest payments, none were actually made. Since Cargo never paid any interest to Pontiac on the advances, the contributions appear to be equity. *See Estate of Mixon*, 464 F.2d at 409–10.

### 11. Ability to Obtain Loans From Outside Lending Institutions

"The purpose of this inquiry is obviously to test whether the shareholder contributors acted in the same manner toward their corporation as ordinary reasonable creditors would have acted." *Estate of Mixon*, 464 F.2d at 410. Indeed, "if no reasonable creditor would have loaned funds to the corporation at the time of the advance, an inference arises that a reasonable shareholder would likewise not so act." *Id.* In this case, evidence exists to show that Cargo could not secure credit from outside sources unless the Cargo shareholders guaranteed the extension of credit. Yet, Stinnett, through Pontiac, made advances to Cargo without securing personal guarantees from Cargo's shareholders. Pontiac failed to act as would a reasonable creditor, and this factor also indicates that the advances were contributions to capital.

### 12. Extent to Which the Advances Were Used to Acquire Capital Assets

While the record is not clear as to what the advances from Pontiac to Cargo were used for, it appears that the advances were used to meet the daily operating needs of Cargo and, therefore, indicates a bona fide indebtedness. *Estate of Mixon*, 464 F.2d at 410.

### 13. Failure of the Corporation to Repay on the Due Date

No due date existed on either the notes or the advances. The notes were due on demand, but Pontiac never demanded payment. A strong inference, therefore, exists that Stinnett never intended to compel Cargo to repay the advances.

After applying the various factors to the facts of this case, it is apparent that the advances were contributions to capital and not bona fide debts. No provision for specific repayment existed on the advances; Pontiac never requested Cargo to repay the loans; and Cargo subordinated Pontiac to its other general creditors. The notes were unsecured. The tax court, therefore, was correct in affirming the Commissioner who held that these advances could not be deducted as bona fide debts, but, in fact, were contributions to capital.

### B. Were Pontiac's Advances to Cargo Constructive Dividends to Stinnett?

█ A corporate distribution to a shareholder is a dividend which the shareholder must include in his gross income if the distribution comes out of current and accumulated earnings and profits. 26 U.S.C.A. § 61(a)(7) (West 1967); 26 U.S.C.A. § 301(c)(1) (West 1978). "[A] transfer of property from one corporation to another corporation may constitute a [constructive] dividend to an individual who has an ownership interest in both corporations." *Sammons v. Commissioner of Internal Revenue*, 472 F.2d 449, 451 (5th Cir.1972).

In *Sammons*, the Fifth Circuit delineated the standard to determine whether a transfer of funds from one corporation to another corporation constitutes a dividend to an

individual who owns shares in both corporations:

> In every case, the transfer must be measured by an objective test [the distribution test]: did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation. If this first assay is satisfied by a transfer of funds from one corporation to another rather than by a transfer to the controlling shareholder, a second, subjective test of purpose must also be satisfied before dividend characterization results. Though a search for intent or purpose is not ordinarily prerequisite to discovery of a dividend, such a subjective test must necessarily be utilized to differentiate between the normal business transactions of related corporations and those transactions designed primarily to benefit the stock-owner.

*Id.* at 451.

The advances from Pontiac to Cargo satisfy the distribution test. Stinnett, the common owner of shares in Cargo and Pontiac, received the funds from Pontiac and transferred them to Cargo as a capital contribution. *Sammons,* 472 F.2d at 453. Such a distribution is effected on the theory "that the funds pass from the transferor to the common stockholder as a dividend and then to the transferee as a capital contribution." *Id.* The only question, therefore, is whether the purpose test has been met in this case.

■ In determining whether the primary purpose test has been met, we must determine not only whether a subjective intent to primarily benefit the shareholders exists, but also whether an actual primary economic benefit exists for the shareholders. *Kuper v. Commissioner of Internal Revenue,* 533 F.2d 152, 160 (5th Cir.1976). The tax court's finding of the primary purposes for the transfers is a question of fact and may not be disturbed unless clearly erroneous. *Kuper,* 533 F.2d at 161; *Sam-*

*mons,* 472 F.2d at 452. In this case, the tax court concluded that the transfers were motivated to primarily benefit Stinnett and not Pontiac. This finding is not clearly erroneous.

■ If Pontiac had not made the advances to Cargo on Stinnett's behalf, Stinnett would have forfeited his interest in Cargo. Moreover, when Cargo was liquidated, Stinnett received $6,000 in the distribution. If the advances had not been made, Stinnett would have been unable to recoup any of his investment. Additionally, Stinnett's ownership interest in Cargo increased from 43% to 55% because of these advances. The evidence indicates that the advances from Pontiac to Cargo benefited Stinnett. We, therefore, must affirm the tax court's ruling. Since the contributions from Pontiac to Cargo satisfy the *Sammons* test, they constitute constructive dividends to Stinnett; and therefore, the tax court properly included the amount of the advances in Stinnett's income.

C. Whether Pontiac Could Deduct Any Portion of the Sum Represented By Its Promissory Note as a Contribution to its Employees' Profit-Sharing Trust.

■ Title 26 U.S.C.A. § 404(a) (West Supp.1983) allows an employer to deduct his contributions to certain profit-sharing plans which qualify under 26 U.S.C.A. § 401 (West Supp.1983). Pontiac maintained such a plan from the early 1960's to 1977. On approximately January 1, 1973, Pontiac issued an interest bearing demand note to that plan in the amount of $33,500, and Pontiac deducted the amount of this note on its corporate income tax return for the taxable year 1972, pursuant to 26 U.S.C.A. § 404(a). The Commissioner disallowed the deduction, holding that the issuance of a promissory note failed to constitute a "payment" under section 404(a). The tax court agreed with the Commissioner.

In *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 97 S.Ct. 850, 51 L.Ed.2d 48

(1977), the Supreme Court held that the issuance of a promissory note, even if such note were fully secured and contained the going interest rate, failed to constitute a payment within the meaning of section 404(a). *Id.* at 578–79, 97 S.Ct. at 856–57. The Court held that "taxpayers must pay out cash or its equivalent . . . ." *Id.* at 579, 97 S.Ct. at 856. Pontiac issued a promissory note and attempted to take a section 404(a) deduction. According to *Don E. Williams Co.*, therefore, Pontiac's promissory note failed to constitute a payment, and Pontiac could not deduct the amount of the note pursuant to 26 U.S.C.A. § 404(a) (West Supp.1983).

Pontiac, however, contends that *Don E. Williams Co.* is inapplicable in this case because the decision was rendered four years after the transaction challenged here. This contention lacks merit. When this transaction occurred, the Supreme Court did not consider promissory notes "payment" for purposes of the Internal Revenue Code. *Helvering v. Price*, 309 U.S. 409, 412–14, 60 S.Ct. 673, 675–76, 84 L.Ed. 836 (1940); *Eckert v. Burnet*, 283 U.S. 140, 141–42, 51 S.Ct. 373, 374, 75 L.Ed. 911 (1931). Pontiac was a cash-basis taxpayer, and therefore, its promissory note failed to constitute a "payment" even before the Court decided *Don E. Williams Co.* Since Pontiac was a cash-basis taxpayer, it is unnecessary to address Pontiac's other contentions which hinge on Pontiac's being an accrual-basis taxpayer.[4] Finding no error, the tax court's decision is affirmed.

AFFIRMED.

---

**4.** Pontiac stipulated that it was a cash-basis taxpayer, but then changed and requested the tax court to relieve Pontiac of its stipulation. The tax court refused, and Pontiac urges us to overrule the tax court. The tax court acted properly.