KELLY, Circuit Judge.
Appellants William Karl Jenkins and M. Earlene Jenkins (collectively, Mr. Jenkins) appeal from an order of the Bankruptcy Appellate Panel (BAP) affirming the bankruptcy court’s dismissal of their claim for the payment of certain secured promissory notes. In re Alternate Fuels, Inc., 507 B.R. 324 (B.A.P. 10th Cir.2014). The bankruptcy court found that Mr. Jenkins’ claim was not an allowed claim because the transfers alleged to be consideration for the notes should be recharacterized as equity contributions. In re Alternate Fuels, Inc., Bankr. No. 09-20173, 2012 WL 6110429, at *12 (Bankr.D.Kan. Dec. 10, 2012). In the alternative, the court found that Mr. Jenkins failed to sustain his burden of proof as to the validity and amount of his claim. Id. at *17. Finally, and again in the alternative, the court found that Mr. Jenkins’ putatively secured claim should be subordinated to the status of an unsecured claim. Id. at *14-15. Our jurisdiction arises under 28 U.S.C. § 158(d), and we reverse. Mr. Jenkins’ transfers do not meet our criteria for either recharac-terization or equitable subordination, and he has satisfied his burden of proof as to the validity and amount of his claim.

Background

Alternate Fuels, Inc. (AFI) is a Kansas corporation that formerly engaged in surface coal mining operations. On December 9, 1992, AFI filed a petition under Chapter 11 of the Bankruptcy Code in the District of Kansas. AFI briefly continued its coal mining operations under the terms of a confirmed plan of reorganization. During this time, Larry Pommier was hired as AFI’s field engineer and financial cost analyst. In 1996, AFI ceased all mining operations and abandoned its assets to various creditors. The Chapter 11 trustee who was operating the reorganized debtor resigned.
At that time, John Warmack acquired 100% of the stock of AFI and assumed control. Mr. Warmack became the sole director of AFI and appointed Mr. Pommier as president. Mr. Warmack then formed Cimarron Energy Co., LLC (Ci-marron) to handle the mining operations for which AFI still held permits. Mr. Warmack owned 99% of Cimarron, and Mr. Pommier owned 1%. Mr. Warmack provided the State of Missouri with certain new reclamation bonds and replacement reclamation bonds, which assured that AFI would restore permitted mining sites to their original condition. Twenty-four certificates of deposit, valued at approximately $1.4 million, were pledged to secure the bonds. Then, Cimarron recommenced mining operations. AFI’s equipment was released to AFI’s secured creditors, who ultimately foreclosed and sold the equipment back to Cimarron. At this time, AFI remained liable for debts which were not addressed in the 1992 bankruptcy.
By 1999, Mr. Warmack had completed his mining efforts, but AFI was still obligated to reclaim the land at the permitted sites. On December 6, 1999, Mr. Jenkins entered into an agreement to purchase Mr. Warmack’s interest in AFI. Mr. Jenkins did not intend to resume mining operations or otherwise operate AFI. Instead, Mr. Jenkins believed that, through his political connections, he could fulfill AFI’s remaining reclamation obligations and obtain the *1144 proceeds of the release of the 24 certificates of deposit and the sale of Cimarron’s mining equipment. I ApltApp. 97.
Mr. Jenkins paid Mr. Warmack $549,250 and received in exchange: (a) 100% of the stock of AFI and 99% of the ownership of Cimarron, (b) certain equipment owned by Cimarron, and (c) the assignment of the 24 certificates of deposit. Because Mr. Jenkins was listed in the Applicant Violator System of the federal Office of Surface Mining, Reclamation, and Enforcement, he arranged for the AFI stock to be placed in the name of a straw man or agent, Michael Christie. Mr. Christie held the beneficial interest in AFI but had no significant involvement with either AFI or Cimarron. Mr. Warmack used the- $549,250 to pay down debts of AFI secured by the Cimar-ron equipment Mr. Jenkins received. Note that the certificates of deposit were assigned to Mr. Jenkins personally — not to AFI or Cimarron. Mr. Jenkins has been receiving interest earned on the certificates since his purchase of Mr. Warmack’s interest in AFI.
Also on December 6, 1999, AFI executed, upon the signature of Mr. Pommier, the first of the three promissory notes attached to Mr. Jenkins’ proof of claim. I ApltApp. 61. The note was in the amount of $500,000, payable to Green Acres Farms, a fictitious business name Mr. Jenkins registered with the State of Missouri. It bears the signature of Mr. Jenkins as witness.
The note states:
Principal balance plus accrued interest shall be due and payable five (5) years from the date shown above. This note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine.
Id. The note identified the underlying consideration as “value received,” and the interest rate was 9.5%.
Mr. Jenkins was aware that AFI had no present ability to repay the note from its own funds. However, as Mr. Pommier testified, if Mr. Jenkins received the proceeds of the release of the certificates of deposit upon the completion of reclamation, AFI would owe no money on the note. IV ApltApp. at 697. Mr. Jenkins testified that the released certificates of deposit were his only anticipated source of future payment.
Cimarron held all of AFI’s assets — comprised primarily of operating and reclamation equipment — and conducted all of its activities. AFI had no income other than advances provided by Mr. Jenkins through checks drawn on accounts of Green Acres Farms. These checks were delivered to Mr. Pommier, who endorsed them immediately for payment to Cimarron. The advanced funds were never deposited into AFI accounts and were therefore never subject to the claims of AFI’s unpaid creditors. There was no contemporaneous accounting of the advances; instead, annual worksheets enumerated his checks to AFI. VI ApltApp. 1152-1280.
On November 6, 2000, AFI executed a second promissory note in the amount of $500,000 “plus any future advances” to “Green Acres Farms or Assigns.” I Aplt. App. 64. The interest rate was 9%, and the note’s terms were otherwise identical to the previous note. Mr. Jenkins did not provide an accounting to connect funds advanced by Green Acres Farms prior to the date of the second note to the amount of that note. Mr. Jenkins again testified that he knew AFI had no prospect of repaying this note from its own funds; his only prospects for future payment were the certificates of deposit.
*1145 On October 11, 2001, Mr. Pommier executed a third promissory note in the amount of $1,000,000 on behalf of AFI. I App. Aplt. 67. Mr. Pommier testified that this note was a replacement for the two prior notes, which Mr. Jenkins denied. The interest rate was 8%, and, again, the note’s terms were otherwise identical to the previous notes. Mr. Jenkins did not provide a contemporaneous accounting to support the amount of the third note.
In 2002, AFI filed a lawsuit (the Cabanas suit) against certain state officers and employees, alleging tortious interference with the completion of AFI’s reclamation process. Alternate Fuels, Inc. v. Cabanas, No. 4:02-cv-01182-JTM (W.D.Mo. filed Dec. 23, 2002). Due to the cessation of reclamation efforts pending the Cabanas suit, Mr. Jenkins “saw that [his] chances of recovering on AFI’s certificates of deposit were diminishing.” Aplt. Br. 17 (citing III ApltApp. 480). Thus, in exchange for Mr. Jenkins continuing to fund AFI and as security for his loans, on March 1, 2003 AFI assigned $3 million of its potential recovery to Mr. Jenkins.[1] Id.; I ApltApp. 59.
On September 6, 2006, a judgment in the Cabanas suit was entered in favor of AFI for actual damages of approximately $5.5 million and punitive damages of $900,000. Following an appeal, and after payment of contingent attorneys fees and costs, the recovery amounted to almost $5 million. News of the judgment spread, and AFI’s creditors began making claims against the judgment proceeds. On January 28, 2009, AFI filed for a second bankruptcy for assistance in determining the priority of payment.
Mr. Jenkins filed a proof of claim against AFI’s estate in the amount of $4.3 million. Id. at 57. The claim included $3.8 million for payment of the three promissory notes, plus interest, secured by AFI’s assignment of $3 million of the Cabanas suit proceeds.[2] Although attachments to the proof of claim include a list of the assigned certificates of deposit in the total principal amount of $1.4 million, these certificates are not. included in the claim because they were assigned to Mr. Jenkins personally — not to AFI. In addition to Mr. Jenkins’ putative secured claim, there are several unsecured claims, totaling $5.7 million, by various construction companies, insurance companies, and the State of Missouri. Three of the largest unsecured claims arose before or during AFI’s first bankruptcy.
Exercising authority under 11 U.S.C. § 105(a) and applying the Tenth Circuit’s established test for recharacterization, the bankruptcy court found that the transfers evidenced by the promissory notes underlying Mr. Jenkins’ claim should be rechar-acterized as equity.[3] In re Alternate Fuels, Inc., 2012 WL 6110429, at *12. Since his recharacterized debt claim was no longer allowed to proceed in AFI’s bank *1146 ruptcy, Mr. Jenkins did not hold a claim secured by the alleged assignment of the Cabanas suit proceeds. Id. at *13.
The court also held, in the alternative, that Mr. Jenkins failed to provide sufficient documentation to prove the amount of his claim. Id. at *17. Although the record showed that Mr. Jenkins had made numerous transfers to AFI, the court found that neither the attachments to the proof of claim nor the trial evidence allowed a determination of the precise amount owed to him. The court noted that his claim was subject to denial on this basis alone. Id.
Finally, the court held, again in the alternative, that equitable subordination under 11 U.S.C. § 510(c) would be appropriate. Id. at *14-15. Finding that Mr. Jenkins had acted inequitably to the detriment of AFI’s creditors, the court subordinated his claim “to the level of an unsecured claim on par with thé other unsecured claims, accompanied by the transfer of the Jenkinses’ interest in the Cabanas judgment to the estate.” Id. at *15.
On appeal, the Tenth Circuit Bankruptcy Appellate Panel (BAP) affirmed. In re Alternate Fuels, Inc., 507 B.R. at 327.

Analysis

I. Recharacterization Is Not Warranted Under These Facts
Although Mr. Jenkins appeals from the BAP’s ruling, the Tenth Circuit reviews the decision of the bankruptcy court, applying the “same standards of review that govern appellate review in other cases.” In re C.W. Mining Co., 749 F.3d 895, 898 (10th Cir.2014). “Whether a transaction labeled as a loan should be recharacterized as an equity investment is a mixed question of fact and law.” In re Hedged-Investments Assocs., Inc., 380 F.3d 1292, 1297 (10th Cir.2004). We review the bankruptcy court’s factual findings for clear error, but the application of our legal test for recharacterization to those facts is a question of law which we review de novo. Id. at 1297-98. We note that, in making its factual findings, the court relied “heavily” upon the exhibits because the two primary fact witnesses— Mr. Jenkins and Mr. Pommier — were not “very credible.” In re Alternate Fuels, Inc., 2012 WL 6110429, at *2.
A. The Tenth Circuit’s Hedgedr-Invest-ments Test Remains Good Law
First, we reject Mr. Jenkins’ argument that two recent Supreme Court decisions implicitly overruled this court’s precedent regarding the proper test for determining when recharacterization is appropriate.
Although the Bankruptcy Code does not expressly address recharacterization, we held in Hedged-Investments that the authority to recharacterize putative debt as equity arises from a court’s general equitable powers under 11 U.S.C. § 105(a). See In re Hedged-Investments, 380 F.3d at 1298 (adopting the Sixth Circuit’s recharacterization analysis in In re AutoStyle Plastics, Inc., 269 F.3d 726, 748, 750 (6th Cir.2001), including its reliance on § 105(a)). Section § 105(a) states:
The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
Recharacterization under § 105(a) is essential to a court’s ability to properly implement the priority scheme of the Bankruptcy Code. See In re Paige, 685 F.3d 1160, 1183 (10th Cir.2012) (explaining that *1147 the Code “requires that certain classes of claimants be paid in full before any member of a subordinate class is paid”).
When a court recharacterizes putative debt as equity, it “effectively ignore[s] the label attached to the transaction at issue and instead recognize[s] its true substance.” In re Hedged-Investments, 380 F.3d at 1297. “The funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution.” Id. The practical effect of recharacterizing a putative debt claim as an equity interest is subordination, since a corporation repays capital contributions only if and when it has satisfied all other obligations. In re AutoStyle Plastics, 269 F.3d at 749. In this way, recharacterization ensures that “controlling equity owners of a troubled corporation [do not] jump the line of the bankruptcy process and thwart the company’s outside creditors’ and investors’ priority rights.” In re Hedged-Investments, 380 F.3d at 1298 (citing In re Mid-Town Produce Terminal, Inc., 599 F.2d 389, 391-92 (10th Cir.1979)).
Mr. Jenkins argues that, under two recent Supreme Court cases, Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), and Law v. Siegel, - U.S. -, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), a bankruptcy court’s authority to recharacterize debt as equity arises not from § 105(a) but from 11 U.S.C. § 502(b). Section 502(b)(1) states:
[A] court ... shall allow [a] claim ... except to the extent that ... such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.
“Applicable law” within the meaning of § 502(b) is state law. See Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (“Congress has generally left the determination of property rights in the assets of a bankrupt’s estate to state law.”). Mr. Jenkins contends that, since § 105(a) is not a proper source of authority to recharacterize a transaction, the 13-factor test outlined in Hedged-Investments is no longer valid.
In Travelers, the Supreme Court considered whether federal bankruptcy law precluded an unsecured creditor from recovering attorney’s fees authorized by a prepetition contract and incurred in post-petition litigation. 549 U.S. at 445, 127 S.Ct. 1199. In the proceedings below, the Ninth Circuit had held that such fees were categorically prohibited by the rule adopted in In re Fobian, 951 F.2d 1149 (9th Cir.1991). Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 167 Fed.Appx. 593, 594 (9th Cir.2006) (“[Attorney fees are not recoverable in bankruptcy for litigating issues peculiar to federal bankruptcy law.”). Reversing the Ninth Circuit, the Supreme Court rejected the Fobian rule because it lacked textual support. The Court explained that, when applying § 502(b), “we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed.” Travelers, 549 U.S. at 452, 127 S.Ct. 1199. This presumption exists because “property interests are created and defined by state law.” Id. at 451, 127 S.Ct. 1199. Unless a specific federal interest requires a contrary result, “there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.” Id. Mr. Jenkins argues that this analysis abrogates the Hedged-Investments test by holding that “a court may not fashion a test ‘solely of its own creation’ in determining what constitutes a ‘claim’ for purposes of bankruptcy.” Aplt. Br. 35.
*1148 In Law, the Supreme Court considered whether a bankruptcy court may require a debtor’s exempt assets to be used to pay administrative expenses incurred as a result of the debtor’s misconduct. 134 S.Ct. at 1192. The Court found this “surcharge” to be unauthorized. The Court explained that, under § 105(a), a bankruptcy court has statutory authority to issue any order that is “necessary or appropriate” to carry out the provisions of the Bankruptcy Code. Id. at 1194. However, it is “hornbook law” that § 105(a) does not allow a bankruptcy court to “override explicit mandates of other sections of the Bankruptcy Code.” Id. Because the bankruptcy court’s order contravened an express provision, § 522, the court “exceeded the limits of its authority under § 105(a) and its inherent powers.” Id. at 1195. Citing this analysis, Mr. Jenkins argues that recharacterization under § 105(a) is not permissible when it would conflict with § 502(b). Aplt. Br. 39-40.
The Fifth and Ninth Circuits have rejected reliance on § 105(a) as a source of authority to recharacterize putative debt, and Mr. Jenkins urges us to follow suit. These circuits have held that, “to determine whether a particular obligation owed by the debtor is a ‘claim’ for purposes of bankruptcy law,” a court must simply “determine whether that, obligation gives the holder of the obligation a ‘right to payment’ under state law.” In re Fitness Holdings Int’l, Inc., 714 F.3d 1141, 1148-49 (9th Cir.2013); see also In re Lothian Oil, Inc., 650 F.3d 539, 542-44 (5th Cir. 2011).
We note that neither Travelers nor Law deal directly with recharacterization. These cases do not mention rechar-acterization or discuss it in any context, and they do not expressly overrule Hedged-Investments or any recharacteri-zation case from any other circuit. Further, Mr. Jenkins’ expansive interpretation of Travelers and Law conflates disallowance of a claim under § 502(b) with re-characterization under § 105(a). Although related, disallowance and recharacterization require different inquiries and serve different functions. Under § 502(b), disal-lowance of a claim is appropriate “when the claimant has no rights vis-a-vis the bankrupt, i.e., when there is ‘no basis in fact or law1 for any recovery from the debtor.” In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc., 453 F.3d 225, 232 (4th Cir. 2006). Recharacterization, on the other hand, is not an inquiry into the enforceability of a claim; instead, it is an inquiry into the true nature of a transaction underlying a claim. In this way, recharacterization is part of a long tradition of courts applying the “substance over form” doctrine. Id. at 233; see also Pepper v. Litton, 308 U.S. 295, 305-06, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (“[Courts] have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.”). Unlike disallowance of a claim, recharacterization of a loan as equity does not ultimately relieve a debtor from his obligation to repay the claimant. Although the claimant may not proceed in bankruptcy — since he no longer holds an allowed “claim” — he may still hold a valid interest in equity to be paid upon satisfaction of the debtor’s other outstanding obligations.
Because disallowance and recharacteri-zation are distinct inquiries, “[e]ven if a claimant is able to meet § 502’s minimal threshold for allowance of the claim,” a court must still “determine the claim’s proper priority” by scrutinizing the true substance of a contested transaction. In re Dornier Aviation, 453 F.3d at 232. We therefore reject Mr. Jenkins’ contention that a court’s power to recharacterize arises solely from the disallowance provi *1149 sion of § 502(b), rather than from § 105(a). Travelers and Law do not instruct otherwise. Travelers held simply that claims enforceable under state law will be allowed in bankruptcy unless they are expressly disallowed. Travelers does not prohibit a court from proceeding to a second step in its analysis, to determine whether an otherwise allowed claim fails in bankruptcy because it involves transactions properly characterized as equity. And Law held simply that a court may not employ § 105(a) to override other explicit mandates in the Bankruptcy Code. Here, no explicit mandate of the Bankruptcy Code prohibits recharacterization under § 105(a).
B. Recharacterization is Not Appropriate Under Hedged-Investments
Mr. Jenkins next argues that, even if the Hedged-Investments test applies, it does not support recharacterization under the circumstances here. We agree.
In Hedged-Investments, we held that bankruptcy courts exercising authority under-§ 105(a) to recharacterize debt as camouflaged equity must apply a 13-factor test. These factors, which reflect the characteristics of an arm’s length negotiation, are:
(1) the names given to the certificates evidencing the indebtedness;
(2) the presence or absence of a fixed maturity date;
(3) the source of payments;
(4) the right to enforce payment of principal and interest;
(5) participation in management flowing as a result;
(6) the status of the contribution in relation to other corporate creditors;
(7) the intent of the parties;
(8) “thin” or adequate capitalization;
(9) the identity of interest between the creditor and stockholder;
(10) the source of interest payments;
(11) the ability of the corporation to obtain loans from outside lenders;
(12) the extent to which funds were used to acquire capital assets; and
(13) the failure of the debtor to repay on the due date or to seek a postponement.
Id. at 1298 (citing Stinnett’s Pontiac Serv., Inc. v. C.I.R., 730 F.2d 634, 638 (11th Cir.1984)). The Hedged-Investments factors are not exclusive, and no single factor is dispositive. Id. at 1298-99. Further, the test is a “highly fact-dependent inquiry.” In re Dornier Aviation, 453 F.3d at 234. The significance of each factor may vary depending on the circumstances. In re Hedgedr-Investments, 380 F.3d at 1298-99.
We begin by emphasizing that Mr. Jenkins was engaged in a venture with substantial risk: he purchased equity in a struggling business with the singular goal of completing reclamation and receiving the proceeds of the certificates of deposit. When the business needed additional financial support to reach its goal, Mr. Jenkins provided advances. We find nothing inherently improper about this arrangement.
The bankruptcy court found that three of the Hedged-Investments factors “superficially support” treating Mr. Jenkins’ advances as loans: the names given to the certificates evidencing the indebtedness, participation in management flowing as a result of the advances, and the extent to which the advances were used to acquire capital assets. In re Alternate Fuels, Inc., 2012 WL 6110429, at *10. We agree that these factors support treating the advances as loans, but their support is not merely superficial.
Concerning the first factor, the three notes are each expressly titled “PROMISSORY NOTE,” and they are *1150 plainly instruments of indebtedness. I Aplt.App. 61, 64, 67. The bankruptcy court discounted this fact by explaining that each document utilized a preprinted form, and the provisions regarding acceleration upon failure to make timely payment and attorney’s fees stated “N/A.” In re Alternate Fuels, Inc., 2012 WL 6110429, at *10. Certainly, our goal is to ensure that a putative claimant may not exalt form over substance. In re Hedged-Investments, 380 F.3d at 1297; In re SubMicron Sys. Corp., 432 F.3d 448, 454 (3d Cir.2006). Yet, we are aware of no rule that all portions of a standardized form must be complete in order for a document labeled as a promissory note — which reflects an unconditional promise to pay a certain party a fixed amount of money, with interest, at a definite time — to be deemed a promissory note.
Furthermore, we have no reason to doubt the explicit label given to the notes since the Trustee does not directly argue, and the bankruptcy court did not find, that they were invalid or unenforceable instruments under Kansas law. To the extent the Trustee questions their validity by arguing that the underlying consideration was insufficient, Aplee. Br. 47, 51, his analysis is misguided. It is true that there is “no direct correlation” between the worksheets enumerating Mr. Jenkins’ checks to AFI and the amount of the notes. In re Alternate Fuels, Inc., 2012 WL 6110429, at *5. For example, one accounting for the year 2000 shows transfers of $710,906.16, VI Aplt.App. 1152, and another shows transfers of $729,774.98, id. at 1189. The note dated November 6, 2000, for $500,000, matches neither amount. The bankruptcy court found, however, that the note amounts do “roughly reflect” the sums of Mr. Jenkins’ checks to AFI during the prior year. In re Alternate Fuels, Inc., 2012 WL 6110429, at *11 (emphasis added).[4]
Regardless, the amount of a promissory note need not precisely correspond to the amount of underlying transfers serving as consideration. This is because, while a contract requires consideration to be valid, Kan. Stat. Ann. § 16-107, in general it need not have a value equivalent to the benefit received. “[CJonsideration legally sufficient for any purpose at all, even the slightest consideration, is sufficient for whatever purpose the parties seek to use it.” In re Alternate Fuels, Inc., 2012 WL 6110429, at *17; 17A Am.Jur.2d Contracts § 115 (2015); see also State ex rel. Ludwick v. Bryant, 237 Kan. 47, 697 P.2d 858, 861 (1985) (“[CJonsideration is sufficient if there is a benefit to the debtor or an inconvenience or deprivation to the creditor.”).
Relatedly, we reject the Trustee’s assertion that, because AFI immediately endorsed Mr. Jenkins’ checks over to Cimar-ron, AFI received no benefit from Mr. Jenkins. Aplee. Br. 47. Many of AFI’s activities were conducted through Cimar-ron, id. at 8., and a company clearly benefits when it is able to fund its operations. Also, advances serving as consideration for a note need not precede the note’s execution. ' See Kan. Stat. Ann. § 84-3-303(a) (2014) (“An instrument is issued or transferred for value if ... [tjhe instrument is issued or transferred for a promise of performance, to the extent the promise has been performed.”); Restatement (First) of Contracts § 75 (2014) (defining consideration to include “a return promise ... bargained for and given in exchange for the promise”). The first promissory note is not unenforceable for lack of consider *1151 ation simply because Mr. Jenkins offered no proof of antecedent transfers to AFI. Thus, the instruments duly labeled as promissory notes have not been shown to be invalid under Kansas law, and we find that the first Hedged-Investments factor weighs against recharacterization.
The bankruptcy court also found that the fifth factor “superficially” suggested debt because there was no evidence that Mr. Jenkins increased his participation in the management of AFI as a result of his advances. We agree, and the court erred when it proceeded to discount this clear finding. Similarly, concerning the twelfth factor, the bankruptcy court held that AFI’s use of Mr. Jenkins’ advances to fund operating expenses rather than to purchase capital assets — indicating debt — is irrelevant because AFI incurred no expenses other than the funding of reclamation operations. This appears to be a tautology. AFI necessarily made a choice between allocating Mr. Jenkins’ funds toward operations or toward capital asset acquisition; it chose the former. This was an obvious decision given AFI’s narrow objectives but a decision nonetheless.
Additionally, we find no support for many of the bankruptcy court’s other findings in favor of recharacterization. For example, the court held that the ninth factor, the identity of interest between the creditor and stockholder, suggests equity. “[I]f advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is indicated.” In re Alternate Fuels, Inc., 2012 WL 6110429, at *12 (citing Both Steel Tube Co. v. C.I.R., 800 F.2d 625, 630 (6th Cir.1986)). We agree this factor may indicate a capital contribution when two or more shareholders own debt in the same proportion as their underlying equity interests. See Bauer v. C.I.R., 748 F.2d 1365, 1370 (9th Cir.1984) (comparing ratios of stock ownership and putative debt in the tax context). Yet the same reasoning does not automatically apply when a single shareholder owns the entirety of a company’s stock. Otherwise, this factor would militate against finding true debt in any situation involving a single stockholder. We see no reason to assume that all funds transferred to a business owned by a single stockholder must be in the nature of equity. To be sure, there may be circumstances where a single stockholder may infuse equity to finance fixed assets • or expand the business. But absent some conscious purpose, and given the nature of recharacterization, we question why a holder of all of a company’s stock would make additional equity investments in exchange for no additional equity; after all, one cannot own more than all of a company’s stock.
Concerning the second factor, the court held that the notes lack a fixed maturity date, indicating a capital contribution. In re Alternate Fuels, Inc., 2012 WL 6110429, at *11; see also Stinnett’s Pontiac Serv., 730 F.2d at 638 (“[T]he presence of a definite maturity date and a definite obligation to repay is a highly significant feature of a debtor-creditor relationship.”). Yet, each note expressly states that the “[principal balance plus accrued interest shall be due and payable five (5) years from the date” of execution. The notes do provide a contingency: in the event of nonpayment within five years, full repayment is due upon the release of the certificates of deposit. But a contingency — even one anticipated as likely by the parties — does not render an otherwise definite deadline illusory for the purposes of this analysis. Similarly, concerning the fourth factor, the notes give Mr. Jenkins the right to enforce payment after five years. Stinnett’s Pontiac Serv., 730 F.2d at 639 (“If a fixed obligation to repay the advances exists, the transaction appears to be a loan.”). The *1152 fact that he did not exercise this contractual right does not render it meaningless.
Concerning the eighth factor, AFI’s undercapitalization, we have held that placing- too heavy an emphasis on undercapitalization in our recharacterization analysis would create an “unhealthy deterrent effect,” causing business owners to fear that, should their “rescue efforts” fail, a court will “give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.” In re Hedged-Investments, 380 F.3d at 1298 n. 1. Given the not insubstantial sum of money Mr. Jenkins paid for his interest in AFI and for his subsequent “rescue efforts,” it is unsurprising that he would seek notes in return. Also, while no one disputes AFI was inadequately capitalized to engage in coal mining, as the dissent highlights, AFI was not engaged in coal mining. Instead, its business was to fulfill reclamation obligations to the State of Missouri.
The seventh factor looks to the intent of the parties — specifically, whether the parties intended the transactions to be loans. In re Hedged-Investments, 380 F.3d at 1299. The bankruptcy court found that Mr. Jenkins never intended the loans to be repaid by AFI. In re Alternate Fuels, Inc., 2012 WL 6110429, at *11. Yet, this finding appears to be informed by the misconceptions outlined above — specifically that, because the amounts of the notes were not directly related to Mr. Jenkins’ transfer to AFI, they lacked adequate consideration and “did not evidence loans in the traditional sense.” Id. Even if, as the bankruptcy court found, the notes served to “secure [Mr.] Jenkins’ investments in AFI and Cimarron,” id., and even if Mr. Jenkins did not subjectively believe that AFI could repay the principal and interest from its own funds within five years, the evidence indicates that he intended the notes to be satisfied pursuant to their second clause: “upon reclamation bond release by the State of Missouri.”[5] Thus, the court’s finding cannot stand.
Certainly, the Trustee is correct that some of the Hedgedr-Investments factors favor recharacterization. Most notably, the eleventh factor analyzes the ability of the corporation to obtain loans from outside lending institutions. “When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.” In re AutoStyle Plastics, 269 F.3d at 752. Here, despite Mr. Jenkins’ efforts to secure outside funding, AFI was unable to obtain any other loans. And the thirteenth factor considers the failure of the debtor to repay on the due date or to seek a postponement. AFI did not pay the notes by their five-year maturity dates and did not seek an extension.
However, despite factors supporting re-characterization, we exercise caution in this arena. We have previously declined to hold broadly that “a - dominant share- *1155 instrumentality or alter ego,” id. at 1301 (quoting In re Fabricators, Inc., 926 F.2d 1458, 1467 (5th Cir.1991)). A majority of courts have described the degree of inequitable conduct warranting subordination as “gross and egregious, tantamount to fraud, misrepresentation, ■ overreaching or spoliation, or involving moral turpitude.” In re Eufaula Indus. Auth., 266 B.R. 483, 489 (B.A.P. 10th Cir.2001).
If a claimant is an “insider” or a “fiduciary” of the debtor, our analysis is less stringent. “[T]he party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider.” In re Hedged-Investments, 380 F.3d at 1301. Here, the bankruptcy court classified Mr. Jenkins as an insider who exercised complete control over AFI throughout the relevant period. In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Mr. Jenkins argues that he delegated all of AFI’s day-to-day operations to Mr. Pommier, and, therefore, he was not an insider; thus, the less stringent insider standard of unfair conduct does not apply. Aplt. Br. 61-63. We need not determine Mr. Jenkins’ status as an insider or non-insider because, under either equitable subordination standard, the court erred in finding that Mr. Jenkins engaged in unfair or inequitable conduct.
First, the Trustee did not argue, and the bankruptcy court did not find, that Mr. Jenkins engaged in any fraud or illegality when obtaining the three notes or taking the assignment of the Cabanas judgment proceeds. Instead, the court held that Mr. Jenkins “breached his fiduciary duties by repeatedly and convincingly stating that his purpose when operating AFI was to secure the release of the Certificates of Deposit for his personal benefit.” In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Even if Mr. Jenkins owed fiduciary duties to AFI, which Mr. Jenkins contests, Aplt. Br. 62-63, helping AFI fulfill obligations owed to the State of Missouri does not constitute a breach of those duties. Indeed, at the time Mr. Jenkins purchased AFI, it was no longer engaged in active mining operations, and its only pursuit was to reclaim permitted lands.
Furthermore, the court did not find that Mr. Jenkins controlled AFI as an instrumentality or mere alter ego, and the Trustee’s argument to the contrary is unpersuasive. We decline to hold broadly that a company becomes the alter ego of its majority shareholder simply because that shareholder funds a project that will ultimately benefit him. And, although AFI was thinly capitalized, “undercapitalization is not in itself inequitable conduct.” In re Hedged-Investments, 380 F.3d at 1302 (quoting In re Lifschultz Fast Freight, 132 F.3d at 345). A dearth of capital resources increases risk for a lender, but the lender typically will have adequate information about such risk unless “trickery”— such as the “exploitation of secret information or misrepresentation of the borrower’s financial health” — upsets ordinary market forces. Id. at 1302-03.
Applying the less stringent insider standard, the bankruptcy court highlights several of Mr. Jenkins’ specific actions as unfair. Although perhaps atypical, none of these acts are “unfair.” For example, Mr. Jenkins arranged for a straw man to hold his interest in AFI because he was listed in the Applicant Violator System (AVS) of the federal Office of Surface Mining, Reclamation, and Enforcement and therefore blocked from being an owner or operator of a coal mining operation in the United States. Yet, Mr. Pommier conceded that Mr. Jenkins’ AVS status would not have actually prevented or in any way affected his purchase of AFI, since he did not intend to “operate” the mining business but simply complete reclamation. Additionally, Mr. Jenkins only adopted the *1156 straw arrangement upon Mr. Pommier’s advice. IV Aplt.App. 645.
The court also noted that Mr. Jenkins failed to account for certain sales of AFI’s or Cimarron’s assets. In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Mr. Pommier alleges that Mr. Jenkins pocketed the sales proceeds, and the court found that Mr. Jenkins did not adequately refute this conclusion. Instead, it held that Mr. Jenkins “probably retained the proceeds for his own benefit” without applying a credit to the notes. Id. at *5. Given that the court found neither Mr. Pommier nor Mr. Jenkins’ testimony to be reliable and the record evidence does not provide clarity, a claim of even “probable” unfair conduct should not serve as the basis for the extreme remedy of equitable subordination.
Furthermore, the court relied heavily on its recharacterization analysis in holding that Mr. Jenkins acted unfairly. The court highlighted that Mr. Jenkins’ “ ‘loans’ to AFI were in fact substitutions for equity or risk capital.” Id. at *14. As discussed above, we hold that Mr. Jenkins’ loans to AFI were indeed loans; thus, he did not act unfairly when executing the promissory notes. In fact, AFI would not have been able to complete reclamation without the funds advanced by Mr. Jenkins. Similarly, the assignment of the Cabanas judgment was not inequitable, since the assignment was valid, enforceable, and supported by consideration.
For the foregoing reasons, we REVERSE the bankruptcy court’s judgment. Neither recharacterization nor equitable subordination is appropriate under these circumstances, and Mr. Jenkins has satisfied his burden of proof as to the validity and amount of his claim.

.On the same date, a fourth note in the principal amount of $2.4 million was executed. VI Aplt.App. 1151. It states that it is a renewal of the first three notes, including accrued interest. The payment terms read: "Principal balance plus accrued interest shall be due and payable on or before five (5) years from the date shown above.... This note shall be paid in full upon reclamation bond release from the State of Missouri or proceeds from lawsuit filed in Federal Court case no. 02CV1182 ....” Id. This fourth note is not included in Mr. Jenkins’ proof of claim.

. Mr. • Jenkins’ claim also included $487,298.62 for "money” related to reclamation and $25,651.56 for "accounts” of Dan Card and Pat Miller. I Aplt.App. 71.

. The court also found that the remainder of Mr. Jenkins' claim, for "money” related to reclamation and for "accounts” of Dan Card and Pat Miller, should be recharacterized. In re Alternate Fuels, Inc., 2012 WL 6110429, at *12. Mr. Jenkins does not appear to appeal the court’s denial of this portion of his claim.

. The court further found that the assignment of the Cabanas suit proceeds as security for funds loaned to AFI was supported by adequate consideration — Mr. Jenkins’ promise to continue loaning money to AFI. Id. at *17.

. Similarly, concerning the third "source of payments” factor, even if Mr. Jenkins did not expect AFI itself to provide an independent source of payment, he expected the release of the certificates of deposit to satisfy the second clause of the notes. In our estimation, this factor does not require recharacterization because the evidence is abundantly clear that Mr. Jenkins expected repayment of debt in accordance with the terms of the notes, rather than to infuse capital. The security arrangements, including the certificates of deposit and assignment of the Cabanas suit proceeds, supra n. 4, do not detract from this. Each potential source of repayment had its own risks; for example, though assigned to Mr. Jenkins, the proceeds of the release of the certificates of deposit were contingent upon completion of the reclamation.