RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

INSIGHT TERMINAL SOLUTIONS, LLC,

                  *Debtor*.

─────────────────────────────────────────

INSIGHT TERMINAL SOLUTIONS, LLC,

              *Plaintiff-Appellant*,

    *v.*

CECELIA FINANCIAL MANAGEMENT, et al.,

                *Defendants*,

BAY BRIDGE EXPORTS, LLC,

      *Intervenor-Defendant-Appellee*.

No. 24-5222

─────────────────

On Appeal from the Bankruptcy Appellate Panel of the Sixth Circuit.
No. 23-8004—Scott W. Dales, Jimmy L. Croom, and
John P. Gustafson, Bankruptcy Appellate Panel Judges.

─────────────────

United States Bankruptcy Court for the Western District of Kentucky at Louisville.
Nos. 3:19-bk-32231; 3:21-ap-03013—Joan A. Lloyd.

Argued:  February 6, 2025

Decided and Filed:  August 25, 2025

Before:  MURPHY, DAVIS, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Jessica Lynn Ellsworth, HOGAN LOVELLS US LLP, Washington, D.C., for Appellant.  Roger G. Jones, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Jessica Lynn Ellsworth, Nathaniel A.G. Zelinsky, HOGAN LOVELLS US LLP, Washington, D.C., David P. Simonds, HOGAN LOVELLS US

LLP, Los Angeles, California, Robert M. Hirsh, NORTON ROSE FULBRIGHT US LLP, New York, New York, for Appellant. Roger G. Jones, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee.

MURPHY, J., delivered the opinion of the court in which DAVIS and BLOOMEKATZ, JJ., concurred. MURPHY, J. (pp. 17–21), also delivered a separate concurring opinion.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge. The Bankruptcy Code gives a bankrupt company's creditors a greater chance than its equity holders of recovering from the estate. So when a company goes bankrupt, equity holders sometimes claim that they advanced money to the company as a loan. But bankruptcy courts have the power to "recharacterize" this alleged loan as a lower-priority infusion of equity. In this case, a bankruptcy court refused to recharacterize a loan as an equity contribution when a businessman arranged for one of his family-owned companies to transfer money to another. Tragically, this man died before the trial over whether to recharacterize the loan. And the court excluded his deposition testimony from that trial because the opposing side lacked the opportunity to cross-examine him. Yet the court committed a critical legal error when making this evidentiary ruling. We thus must reverse and remand for further proceedings.

I

John Siegel worked in the coal industry his entire adult life. He made (and lost) a lot of money in this "feast or famine business." Siegel Dep., Bankr. R.70, PageID 16. Near the end of his career, Siegel tried to develop a port terminal for coal shipments in Oakland, California. He viewed this project as so potentially lucrative that it could "pay [his] great-grandchildren money." *Id.*, PageID 28.

Siegel relied on family-owned limited liability companies to operate his coal projects. To facilitate the terminal project, he directed some family-owned companies to send money to other such companies. And this complex case boils down to a relatively simple question: Did the fund-paying companies make a *loan* to—or invest *equity* in—the companies that received the funds?

A

We start by explaining why this question matters.  After a company goes into bankruptcy, the Bankruptcy Code provides the default priority rules for how to distribute the company's (too few) assets across its (too many) creditors.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017); 11 U.S.C. § 726(a)(1)–(6).  These rules make it critical to identify the nature of a party's payment of money to the now-bankrupt company.  *See Czyzewski*, 580 U.S. at 457.  Did the party provide money as an owner who obtained an equity interest?  Or did the party make a loan as a creditor who obtained a promise to pay the money back?  In bankruptcy, a company's creditors have higher priority than a company's owners.  *See id.*  Indeed, the owners will receive none of the bankrupt company's assets unless the company pays all creditors in full.  *See id.*

Under our precedent, a party who files a claim in a company's bankruptcy cannot simply assert that its prior payment to the company qualifies as a higher-priority loan (making the party a creditor) rather than a lower-priority equity contribution (making the party an owner).  *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 748–49 (6th Cir. 2001).  Bankruptcy courts instead have the authority to "recharacterize" the party's claimed loan as an equity contribution.  *See id.*  This recharacterization makes the party's claim subordinate to those of the company's other creditors, so the party has less of a chance to recover any of its money in the bankruptcy.  *See id.*

How should bankruptcy courts decide whether a payment qualified as an equity contribution or a loan?  In *AutoStyle*, we told those courts to follow a test that we first adopted in the tax context.  *See id.* at 749–50, 749 n.12.  Under that test, courts should consider eleven factors that ask the following questions: First, what "names" did the parties give to the "instruments" recording the "indebtedness"?  *Id.* at 750.  Second, did the advances to the bankrupt company come with "a fixed maturity date and schedule of payments"?  *Id.*  Third, did those advances include "a fixed rate of interest and interest payments"?  *Id.*  Fourth, what was the bankrupt company's "source of repayments" for the advances?  *Id.*  Fifth, did this company have adequate capital when the alleged lender paid the money?  *Id.*  Sixth, did the alleged lender provide a sum only proportional to its equity in the company (which would suggest an equity contribution) or a greater amount (which would suggest a loan)?  *Id.* at 750–51.  Seventh, did the company post any "security"?  *Id.* at 750.  Eighth, did the company have the "ability to obtain

financing from outside lending institutions" at the time of the alleged loan? *Id.* Ninth, did the parties subordinate the money advances "to the claims of outside creditors"? *Id.* Tenth, did the company use the money "to acquire capital assets"? *Id.* And eleventh, did the company create a "sinking fund" to pay the debt? *Id.* We have clarified that bankruptcy courts should not treat any of these so-called "*AutoStyle* factors" as dispositive and that the ultimate debt-versus-equity conclusion depends on the facts of each case. *See id.*

B

The facts of this case begin in 2014. That year, Terminal Logistics Solutions, LLC, paid $700,000 to obtain an option "to enter into a 66-year sublease" of the Oakland port terminal. Undisputed Facts, Bankr. R.106, PageID 2–3. Bowie Resource Partners, LLC, owned Terminal Logistics. Bowie, in turn, was 54% owned by a Siegel family company and 46% owned by a business partner's company.

Terminal Logistics failed to enter a sublease agreement within the time allowed by the option contract. So it repeatedly extended the option's expiration date by paying more fees through 2017. To help Terminal Logistics pay for these extensions, Bowie funded the company with equity contributions up to September 2016. Starting in late 2016, though, Bowie changed its financing method. It compelled Terminal Logistics to sign a promissory note to receive further payments.

In 2017, Siegel had a falling out with the business partner that partially owned Bowie. This partner prohibited Bowie from participating further in Terminal Logistics' business. So Siegel began to use two other limited liability companies for the terminal project. On the financing side, Bowie assigned its rights, interests, and obligations in Terminal Logistics' business to Cecelia Financial Management, LLC. Siegel's wife and sons owned Cecelia, and Siegel managed this company. On the project side, Terminal Logistics assigned its interest in the sublease option contract to a company formed in 2017: Insight Terminal Solutions, LLC. Siegel's wife indirectly owned Insight (through her ownership of yet another limited liability company), and Siegel managed this company too.

By 2019, Cecelia had advanced about $5.7 million to Insight through a series of promissory notes that repeatedly amended the original note entered by Terminal Logistics. Siegel signed these notes on Cecelia's behalf. And a corporate officer who worked for Siegel signed the notes on Insight's behalf. So Siegel was "on both sides" of the notes. Siegel Dep., Bankr. R.70, PageID 23. The fourth (and final) amended promissory note (which resembled the earlier ones) said it was due on Cecelia's "demand" or on a "Maturity Date" of three years from the date of the note. 4th Am. Note, R.114, PageID 230. It included a 6% interest rate. Except in limited circumstances, though, the note did not require Insight to pay any interest or principal until the Maturity Date. And Insight never made a payment to Cecelia on any of these notes.

Apart from Cecelia, Insight received financing from a few other sources over the years. To start, two other Siegel family-owned businesses provided funds to Insight. But these payments do not matter on appeal.

Next, before Cecelia provided most of its funding to Insight in 2019, Insight had received loans from two third-party companies that Siegel and his family did not own. Insight first obtained a $5-million loan from Bay Bridge Exports, LLC, in May 2018. Bay Bridge's chairman and CEO was a "good friend" of Siegel's. Siegel Dep., Bankr. R.70, PageID 25. Bay Bridge set a 10% interest rate. Like Insight's promissory notes with Cecelia, the loan did not require Insight to pay any principal or interest until its maturity date a year later. Unlike those notes, though, the agreement gave Bay Bridge the right to convert the loan into a 50% ownership interest in Insight.

In September 2018, Insight also obtained a $6.8-million loan from Autumn Wind Lending, LLC. To provide this loan, Autumn Wind required Insight to restructure its Bay Bridge loan. Bay Bridge issued an amended loan of $5.5 million to *Siegel personally* rather than *Insight*. Insight agreed to pay Autumn Wind's loan back on the maturity date in December 2019. The agreement also noted that Autumn Wind would obtain a security interest in Insight's assets.

On the same date of Autumn Wind's loan, Insight finally obtained a sublease of the port terminal. But this initial success proved short lived. The company generated no revenue from its creation through July 2019. That month, Insight sought a reorganization in bankruptcy under Chapter 11 of the Bankruptcy Code.

C

During the bankruptcy proceedings, a bankruptcy court confirmed a reorganization plan proposed by Autumn Wind. Under this plan, Autumn Wind would become Insight's new owner (and obtain the right to the terminal sublease). The plan contemplated that the reorganized Insight would pay all allowed claims of all unsecured creditors and thus would not impair their interests. Autumn Wind agreed to set aside $5 million for these claims, and a related entity agreed to guarantee payment if the claims exceeded that amount. But the plan also made clear that the reorganized Insight could still object to any creditor's claim and had no duty to pay a creditor until its claim became an "allowed" one. As for Insight's owners, the plan fully extinguished their equity interests.

Before the court confirmed the plan, Cecelia had filed a proof of claim for over $6 million based on the amounts it provided to Insight. Although the promissory notes documented these payments as a loan, Autumn Wind believed that Cecelia had instead provided Insight with an equity contribution. After the plan confirmation, Insight (operated by Autumn Wind) filed an adversary complaint against (as relevant now) Cecelia and Siegel in April 2021. Insight asked the bankruptcy court to recharacterize Cecelia's claim for debt as one for equity under the *AutoStyle* factors. This recharacterization would effectively extinguish Cecelia's claim because equity holders received nothing under the confirmed plan. The complaint also alleged that Siegel committed fraud because Insight had promised not to take on additional loans in the 2018 loan agreement with Autumn Wind and yet Siegel continued to arrange the loans from Cecelia in 2019.

Three pretrial events affected this litigation. The parties first entered a stipulation that helped both sides. Insight agreed to dismiss the fraud claim against Siegel. Cecelia agreed to reduce the claim it asserted against Insight in the bankruptcy.

Bay Bridge next moved to intervene as a defendant. Bay Bridge's $5.5-million restructured loan to Siegel made this dispute important to Bay Bridge because it obtained a security interest in Cecelia's claim against Insight. The bankruptcy court granted the motion to intervene. Cecelia later assigned Cecelia's claim in its entirety to Bay Bridge. Bay Bridge thus took over the defense of the claim in the adversary proceeding.

Sadly, Siegel also developed cancer. The parties sought to preserve his testimony through a deposition in case he could not appear at trial. On January 20 and 21, 2022, Insight deposed Siegel as Cecelia's corporate representative under Federal Rule of Civil Procedure 30(b)(6). Given Siegel's declining health, though, Insight could not complete its direct examination on these days, and Cecelia and Bay Bridge could not conduct any cross examinations. The parties failed to complete the deposition before Siegel passed away.

The bankruptcy court eventually held a two-day trial. Insight sought to use Siegel's deposition at trial to support its argument that Cecelia had provided an equity contribution rather than a loan to Insight. At the start of the trial, however, Bay Bridge moved to exclude Siegel's deposition as inadmissible hearsay. The court opted to admit the deposition "under proffer" and determine its admissibility after trial. Tr., R.117, PageID 28. But the court suggested it was unlikely to use the deposition because it was "inherently prejudicial" given that Bay Bridge could not cross-examine Siegel. *Id.*, PageID 29.

After one witness testified and the parties presented closing arguments, the bankruptcy court asked each side to prepare proposed "findings of fact and conclusions of law" for its review. Tr., R.118, PageID 68. Ultimately, the court adopted verbatim Bay Bridge's 48-page opinion, including even its typos and formatting errors. *Compare* Proposed Op., Bankr. R.124-1, PageID 1–48, *with* Op., Bankr. R.125, PageID 1–47. This party-drafted opinion reached two conclusions that matter now. The court first held that Siegel's deposition was inadmissible. The court then rejected Insight's claim that it should recharacterize Cecelia's loans as equity contributions under the eleven *AutoStyle* factors.

A bankruptcy appellate panel affirmed. *See In re Insight Terminal Sols., LLC*, 657 B.R. 78, 93 (B.A.P. 6th Cir. 2024). We review the bankruptcy court's decision de novo without deferring to the appellate panel's decision. *See In re Curry*, 509 F.3d 735, 735 (6th Cir. 2007).

II

Insight makes three arguments on appeal. It argues that the bankruptcy court wrongly excluded Siegel's deposition from the trial. It argues that the bankruptcy court wrongly refused to recharacterize Cecelia's loans to Insight as equity contributions. And it argues that the bankruptcy court wrongly adopted Bay Bridge's proposed opinion without making any changes. We must reverse the bankruptcy court's opinion based on the first issue alone, so we need not resolve the remaining two at this time.

The Federal Rules of Evidence generally prohibit litigants from relying on hearsay (out-of-court statements offered for the truth of the matter asserted) unless the litigants can fit that evidence into one of the exceptions to the hearsay ban. Fed. R. Evid. 801(c), 802. The parties agree that Siegel's deposition testimony would generally qualify as hearsay. But they disagree over whether it falls within any hearsay exception. Insight argues that the bankruptcy court should have admitted Siegel's deposition under two hearsay carveouts: one in Federal Rule of Civil Procedure 32(a) ("Civil Rule 32(a)"), and the other in Federal Rule of Evidence 801(d)(2) ("Evidence Rule 801(d)(2)"). We will consider these two rules in turn.

A

Civil Rule 32 covers hearsay that a declarant makes during a deposition. The rule provides that "all or part of a deposition may be used against a party" at trial if the deposition satisfies three "conditions[.]" Fed. R. Civ. P. 32(a)(1). First, the party against whom the deposition will be used must have been "present or represented at the taking of the deposition or had reasonable notice of it[.]" Fed. R. Civ. P. 32(a)(1)(A). Second, the deponent's statements must have been "admissible under the Federal Rules of Evidence if the deponent were present and testifying" at trial. Fed. R. Civ. P. 32(a)(1)(B). And third, the proponent of the deposition must seek to use it for one of the permissible reasons listed in "Rule 32(a)(2) through (8)." Fed. R. Civ. P. 32(a)(1)(C). Among other permissible reasons, Rule 32(a) allows a party to use a

deposition of an "[u]navailable [w]itness"—including a witness who "is dead"—"for any purpose[.]" Fed. R. Civ. P. 32(a)(4)(A).

Bay Bridge does not dispute that Insight met all three *express* conditions to use Siegel's deposition at trial. Bay Bridge's lawyer represented the company at Siegel's deposition. *See* Fed R. Civ. P. 32(a)(1)(A). Next, Insight conceded that it could use only the portions of Siegel's deposition that would "be admissible" if Siegel had testified in person. *See* Fed. R. Civ. P. 32(a)(1)(B). Lastly, Siegel died before trial. *See* Fed. R. Civ. P. 32(a)(1)(C), (a)(4)(A).

So why did Bay Bridge challenge Siegel's deposition? The company argued that Rule 32 also contained an *implied* condition: that the opposing party must have had an adequate opportunity to cross-examine a declarant before the declarant died. Because the bankruptcy court adopted Bay Bridge's proposed opinion, it accepted this view of Rule 32. It stated: "Courts have uniformly held that Rule 32(a)(1) *requires* that the party opposing admission of the statement have had a reasonable opportunity to cross-examine the deponent." Op., Bankr. R.125, PageID 7 (emphasis added). The court thus found Siegel's deposition "inadmissible" because Bay Bridge lacked "any opportunity to cross-examine" him before he died. *Id.* We generally review this type of evidentiary ruling under a deferential abuse-of-discretion standard. *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010). Yet a court abuses its discretion if it commits a legal error, and we review the court's legal conclusions de novo. *See id.*

The bankruptcy court committed this type of legal error by reading Rule 32(a) as absolutely barring the use of a deposition if the opposing party lacked an opportunity to cross-examine the declarant. Nothing in the text of Rule 32(a) adopts Bay Bridge's categorical cross-examination requirement. To the contrary, the text provides that a deposition "*may* be used" by a party if the party satisfies the three conditions listed in the rule. Fed. R. Civ. P. 32(a)(1) (emphasis added). The rule thus suggests that the party has a "right" to use the deposition once the party proves those conditions. 8A Charles A. Wright et al., *Federal Practice and Procedure* § 2146, at 645 (3d ed. 2010) (quoting *Wright Root Beer Co. v. Dr. Pepper Co.*, 414 F.2d 887, 890 (5th Cir. 1969)). And Bay Bridge does not try to place its cross-examination requirement within any of the conditions. So a basic interpretive principle (the expression of one thing is the

exclusion of another) should make courts wary of adding an implied requirement on top of the express ones that the rule drafters listed. *See, e.g.*, *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014); *TRW Inc. v. Andrews*, 534 U.S. 19, 28–29 (2001).

The relevant caselaw points in the same direction. Federal courts have uniformly held that trial courts have "*discretion* whether to admit [a] deposition" when the opposing side lacked any cross-examination opportunity because of the declarant's death. 8A Wright, *supra*, § 2146, at 646 (emphasis added); *see In re Reingold*, 1998 WL 612494, at *2 (5th Cir. Aug. 28, 1998) (per curiam); *Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d 724, 727–28, 728 n.5 (9th Cir. 1969); *Derewecki v. Pa. R. Co.*, 353 F.2d 436, 442–43 (3d Cir. 1965); *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 49–51 (S.D.N.Y. 1989); *see also Treharne v. Callahan*, 426 F.2d 58, 62–63 (3d Cir. 1970). These courts have explained that "no hard and fast rule" exists over this question. *Derewecki*, 353 F.2d at 443 (citing *Inland Bonding Co. v. Mainland Nat'l Bank*, 3 F.R.D. 438, 438–39 (D.N.J. 1944)). Rather, a district court must balance a party's "right of cross-examination" against the other party's need for the deposition on a case-by-case basis. *Id.* at 442.

If anything, one might ask why courts have a discretionary power to *exclude* a deposition for lack of cross-examination if the party seeking to admit the deposition seems to have met the "literal language" of the rule. *Id.* at 443. Perhaps background principles might help answer that question. Historically, many courts (especially those overseeing equity cases) held that they had the discretionary power to admit or exclude the direct examination of a trial witness who had died before the opposing party could cross-examine the witness. *See, e.g.*, *Scott v. McCann*, 24 A. 536, 537–38 (Md. 1892); *Forrest v. Kissam*, 7 Hill 463, 466–71 (N.Y. Sup. Ct. 1844); *see also* 1 *McCormick on Evidence* § 19 (9th ed.), Westlaw (database updated Feb. 2025); 3 John Henry Wigmore, *Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 1390, at 84 (2d ed. 1923). Rule 32(a) might be read to incorporate this principle governing *live* trial testimony into the requirements for the use of *deposition* testimony at trial. The rule requires deposition testimony to have been "admissible under the Federal Rules of Evidence if the deponent were present and testifying" at trial. Fed. R. Civ. P. 32(a)(1)(B). And if courts still have discretion over whether to strike the direct testimony of trial witnesses who die before their

cross examination, perhaps this rule can be read to give them discretion to do the same for deponents. Ultimately, though, we need not explore this question further. Insight does not dispute that the bankruptcy court had the discretion to exclude Siegel's deposition. We thus may simply assume this discretionary authority. Still, the bankruptcy court misread the law by holding that it had to exclude the deposition for lack of cross-examination as a matter of law.

Nothing that Bay Bridge says now convinces us otherwise. It first notes that we have sometimes emphasized the importance of cross-examination to ensure the reliability of testimony. *See In re Complaint of Paducah Towing Co.*, 692 F.2d 412, 418–19 (6th Cir. 1982). But *Paducah Towing* did not involve Rule 32(a). And a district court may take these reliability concerns into account when deciding as a discretionary matter whether to admit the deposition under that rule.

The out-of-circuit cases on which Bay Bridge relies also offer it no help. To be sure, some circuits in some cases have upheld the discretionary exclusion of deposition testimony because the opposing party lacked the opportunity to cross-examine the declarant. *See, e.g.*, *Briggs v. Marshall*, 93 F.3d 355, 362 (7th Cir. 1996); *Bobb v. Modern Prods., Inc.*, 648 F.2d 1051, 1055 (5th Cir. 1981), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc). But a large difference exists between these *discretionary* decisions and the bankruptcy court's view that Rule 32(a) *categorically* bars the use of a deposition in these circumstances.

An analogy to the First Step Act confirms our point. That law gives district courts the authority to reduce the sentence of a prisoner who meets various eligibility requirements. *See United States v. Beamus*, 943 F.3d 789, 791 (6th Cir. 2019) (per curiam). We have held that a district court commits reversible legal error if it denies relief based on a mistaken view that a defendant has not met those requirements—even if the court could have denied relief as a discretionary matter. *See id.* at 791–92. In that scenario, we have remanded for the district court to exercise the discretion it failed to undertake the first time around. *See id.* at 792. We take the same path here.

Bay Bridge next argues that the bankruptcy court did not, in fact, think it was "bound" to reject the deposition for lack of cross-examination. Appellee's Br. 24. Yet the court nowhere recognized the discretion that it had on this matter. Rather, it observed (in an opinion that Bay Bridge drafted) that the caselaw "requires" exclusion when a party does not have a cross-examination opportunity. Op., Bankr. R.125, PageID 7. Its categorical (and mistaken) language could not have been clearer.

Bay Bridge lastly turns to a harmless-error claim. It notes that the bankruptcy court also said (in two sentences that Bay Bridge drafted) that Siegel's deposition would not have changed "the outcome" because the deposition and trial evidence were "largely redundant[.]" *Id.*, PageID 14. But the court offered no support for this conclusory assertion. And Siegel's testimony provided substantial information that we cannot find anywhere else. Consider two examples. We have explained that a court should be more likely to treat a transfer of money as a debt if it appears that the parties engaged in an "arm's length negotiation" over the purported loan's terms. *AutoStyle*, 269 F.3d at 750 (citation omitted). Yet Siegel testified that he "didn't concern" himself with the "language" of the promissory notes because his "family company [was] the lender" and his companies were on "both sides" of the transaction. Siegel Dep., Bankr. R.70, PageID 23, 26. So the two family-owned companies simply picked the maturity date from a "generic template" and merely "pulled" the 6% interest rate "out of the air[.]" *Id.*, PageID 26, 28. This evidence matters to the question whether the companies engaged in an arms-length negotiation.

Likewise, we have explained that a court should be more likely to treat a transfer of money as an equity contribution if "the expectation of repayment depends solely on the success of the borrower's business[.]" *AutoStyle*, 269 F.3d at 751. And Siegel testified that he did not find it "important whether [Cecelia] got paid in two years or three years" because the terminal project, if successful, could generate a windfall. Siegel Dep., Bankr. R.70, PageID 28. He added that Cecelia kept extending the maturity dates for the restructured loans because Insight and Cecelia had "ultimate confidence" in *themselves*. *Id.*, PageID 27. This evidence matters to the question whether Cecelia expected repayment only if the terminal project succeeded.

In short, we agree with the bankruptcy appellate panel that Siegel was the "key witness" and that the admission of his deposition was a "crucial evidentiary issue." *Insight*, 657 B.R. at 82, 86. The bankruptcy court thus did not commit a harmless legal error when excluding it.

B

Apart from Civil Rule 32, Insight alternatively argues that the bankruptcy court should have admitted Siegel's testimony under a different hearsay exception in Evidence Rule 801(d)(2). That rule excludes from the definition of "hearsay" a statement that "is offered against an opposing party" and that satisfies any one of four conditions. Fed. R. Evid. 801(d)(2). Specifically, a statement does not qualify as hearsay against an opposing party if it:

> (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

*Id.*

In the bankruptcy court, Bay Bridge did not dispute that Evidence Rule 801(d)(2) would apply if Insight had tried to use Siegel's deposition *against Cecelia* because Siegel testified as that company's Rule 30(b)(6) representative. By the time of trial, however, Cecelia had transferred its claim against Insight to Bay Bridge. And Bay Bridge argued that this rule did not allow Insight to admit Siegel's deposition *against Bay Bridge* because Siegel had no connection to that company. The bankruptcy court agreed. It reasoned that a party may not use hearsay against an adversary under Evidence Rule 801(d)(2) just because it could have used the hearsay against the adversary's "predecessor in interest." Op., Bankr. R.125, PageID 12.

This conclusion implicated a then-existing circuit conflict over the meaning of Evidence Rule 801(d)(2). Some courts had held that the rule allowed a litigant to introduce an out-of-court statement against an opposing party that had obtained a claim derivatively from another entity if the rule would have allowed the statement's use against that other entity. *See, e.g.*, *Phillips v. Grady Cnty. Bd. of Cnty. Comm'rs*, 92 F. App'x 692, 696 (10th Cir. 2004). Other courts had

held that Evidence Rule 801(d)(2) did not permit this "privity" theory of admissibility. *See, e.g.*, *Three Rivers Confections, LLC v. Warman*, 660 F. App'x 103, 109 (3d Cir. 2016) (per curiam); *Huff v. White Motor Corp.*, 609 F.2d 286, 290–91 (7th Cir. 1979). And our own cases could be read to sit on either side of this split. *Compare Calhoun v. Baylor*, 646 F.2d 1158, 1162–63 (6th Cir. 1981), *with Est. of Shafer v. Comm'r*, 749 F.2d 1216, 1220 (6th Cir. 1984).

Thankfully, a recent development makes it unnecessary for us to reconcile these cases. After Insight appealed, the Supreme Court amended Evidence Rule 801(d)(2) to resolve the conflict. The rule now states that "[i]f a party's claim, defense, or potential liability is directly derived from a declarant or the declarant's principal, a statement that would be admissible against the declarant or the principal under this rule is also admissible against the party." Fed. R. Evid. 801(d)(2). When amending Evidence Rule 801(d)(2), the Court made clear that the amended rule "shall take effect on December 1, 2024, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order Amending Federal Rules of Evidence, at 3 (Apr. 2, 2024); *see also* 28 U.S.C. § 2074(a).

Should this amendment apply here? Bay Bridge argues that it would not be "just and practicable" to reverse the bankruptcy court for failing to apply an amendment that arose well after the court issued a final judgment. Order Amending Federal Rules of Evidence, at 3. It has a point. The Supreme Court has suggested that "the promulgation of a new rule of evidence would not require an appellate remand for a new trial." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 n.29 (1994). Yet we need not decide whether we would have reversed the bankruptcy court based on this amendment *alone*. We are already reversing that court because of its mistaken reading of Civil Rule 32(a). As a result, we must ask only whether the amendment should govern on remand.

It should. Courts have generally found it "just and practicable" for district courts to apply new federal rules in pending proceedings. *See United States v. Ristovski*, 312 F.3d 206, 212 (6th Cir. 2002); *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997); *see also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 334 n.2 (5th Cir. 2004). And since we are instructing the bankruptcy court to reevaluate the admissibility of Siegel's deposition under the proper legal standards, we find it "just and practicable" for that court to apply the

*current* legal standards.  Order Amending Federal Rules of Evidence, at 3.  Indeed, Bay Bridge fails to identify the types of "injustice"—such as an unfair retroactive waiver—that have led us to refrain from applying a new federal rule in a case that was pending in a trial court when the rule became effective.  28 U.S.C. § 2074(a); *see United States v. Bankston*, 820 F.3d 215, 228–29 (6th Cir. 2016).

How does this amendment affect the admissibility of Siegel's deposition?  On appeal, Bay Bridge did not appear to dispute the deposition's admissibility under the revised Evidence Rule 801(d)(2).  But Insight also left unclear which of that rule's five subparagraphs would cover Siegel's deposition.  Ultimately, we will give Insight and Bay Bridge a fresh opportunity to fully develop their arguments under the revised rule in the bankruptcy court in the first instance.

One last point—applicable to both Civil Rule 32(a) and Evidence Rule 801(d)(2).  Bay Bridge argues that Insight forfeited its right to use Siegel's deposition against Bay Bridge because it sought to admit this testimony only *against Cecelia* in the bankruptcy court.  We need not decide whether Bay Bridge accurately characterizes Insight's arguments because, no matter those arguments, the bankruptcy court resolved whether to admit Siegel's testimony against Bay Bridge.  It rejected Insight's efforts to admit Siegel's deposition under Evidence Rule 801(d)(2) on the ground that Insight sought to use this deposition "*against Bay Bridge*, the only opposing party present at trial[.]"  Op., Bankr. R.125, PageID 11 (emphasis added).  And a losing party may challenge an issue that a lower court "resolves"—even if the party did not adequately raise the issue.  *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011).  That rule applies here.

\* \* \*

Because we reverse the bankruptcy court based on its mistaken evidentiary analysis, we need not consider Insight's other arguments: that the court misapplied the *AutoStyle* factors and wrongly adopted an opinion drafted by Bay Bridge.  That said, appellate courts have repeatedly expressed displeasure with a lower court's decision to use one party's proposed "findings of fact and conclusions of law" when ruling against the other side.  *Kilburn v. United States*, 938 F.2d 666, 671 (6th Cir. 1991) (collecting cases).  Although we review this type of decision for an abuse of discretion, *id.* at 671–72, we expect to see evidence that the lower court exercised

"independent judgment" when ruling on the issues in the case, *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 301 (3d. Cir. 2005). That evidence might take the form of, for example, edits to the party-proposed draft. *See Kilburn*, 938 F.2d at 671–72. Here, though, the court did not make a single edit. Insight thus has raised a serious concern with the bankruptcy court's current resolution. That court should keep these principles in mind when it reconsiders the admissibility of Siegel's deposition and, if the deposition is admitted, any impact that it might have on the *AutoStyle* factors.

We reverse and remand for proceedings consistent with this opinion.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring. Our caselaw has given bankruptcy courts an extraordinary federal power: the power to turn a company's creditors into its owners by "recharacterizing" their loans as equity contributions. However much I peruse the Bankruptcy Code, I cannot find this significant power in its text. So, while we need not reach the issue to resolve today's appeal, I write to highlight significant concerns with our current law.

The Bankruptcy Code treats creditors better than owners. All creditors must get paid in full out of a bankrupt company's assets before any owner can see a dime. *See Czyzewski v. Jevic Hold. Corp.*, 580 U.S. 451, 457 (2017); 11 U.S.C. § 726(a)(1)–(6). The code also allows a "creditor" to "file a proof of claim" in the bankruptcy, but it compels an "equity security holder" to file only "a proof of interest" there. 11 U.S.C. § 501(a). The code thus makes it important to distinguish the parties who qualify as creditors from those who qualify as owners.

Yet the code offers little guidance on this distinction. It defines "equity security holder" as a "holder of an equity security of the debtor[.]" *Id.* § 101(17). And it defines "equity security" to include a "share in a corporation" or "similar security[.]" *Id.* § 101(16)(A). On the other hand, the code defines "creditor" as (among other things) an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" *Id.* § 101(10)(A). And it defines "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" *Id.* § 101(5)(A). So a debtor's owner possesses a "share" of (or "similar security" in) the debtor, while its creditor has a "right to payment" from the debtor on a "claim." But the code does not otherwise define what it means by "similar security" (in the "equity security" definition) or "right to payment" (in the "claim" definition). Should federal courts develop a federal body of law based on general principles to interpret these words?

No, the Supreme Court has long looked to state law to fill this void. It has explained that "[s]tate law usually determines whether a person has" a "right to payment" (and so a claim) under the Bankruptcy Code. *Midland Funding, LLC v. Johnson*, 581 U.S. 224, 228 (2017); *see Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 54–55 (1979). This rule makes sense. When one party gives another money with the expectation of repayment, whether the payee has a duty of repayment (and thus whether the payment qualifies as an enforceable "loan") has long depended on *state* contract law. *See, e.g.*, *First Nat'l Bank v. Kentucky*, 76 U.S. 353, 362 (1870). I thus agree with the two circuit courts that have found that state law should determine whether a payment of money from one party to another qualifies as a valid loan or the creation of some type of equity security. *See In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1146–49 (9th Cir. 2013); *In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011).

Yet our court has not taken this approach. Like other circuits, we have held that bankruptcy courts have the *federal* authority to decide that a loan qualifies as an equity contribution. *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749–50 & n.12 (6th Cir. 2001); *see also In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1146–49 (10th Cir. 2015); *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231–33 (4th Cir. 2006); *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454–56 (3d Cir. 2006). We have identified eleven factors to distinguish debt from equity. *See AutoStyle*, 269 F.3d at 749–50. But we have added that the right label will depend on each case's facts. *See id.* at 750.

For several reasons, I doubt that bankruptcy courts have a standalone federal power to recharacterize a payment of money as a purchase of equity if state law would treat that payment as a valid loan. *First*, the Bankruptcy Code's text does not expressly permit this practice. Indeed, all agree that "no specific provision of the Bankruptcy Code" gives bankruptcy courts the power to disallow a creditor's claim by recharacterizing a loan as an equity contribution. *AutoStyle*, 269 F.3d at 748. I find this omission significant. After all, the Supreme Court has refused to rely on "statutory silence" as the basis to disrupt the Bankruptcy Code's priority scheme. *Czyzewski*, 580 U.S. at 465. Yet any implied recharacterization effectively departs

from that scheme by turning higher-priority creditors into lower-priority owners.  This implied power stands out because Congress did not simply ignore the risk that a creditor might file an improper claim for payment from the bankruptcy estate.  Congress instead identified "nine" situations in which the court could refuse to honor creditor claims.  *Travelers*, 549 U.S. at 449; *see* 11 U.S.C. § 502(b).  By *expressly* listing the situations in which bankruptcy courts may disallow claims, Congress presumably did not intend to give those courts the *implied* power to disallow claims in every other situation where they find disallowance just.  *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 28–29 (2001).

*Second*, the statutory "history" of the Bankruptcy Code does not suggest that bankruptcy courts ever had this type of implied authority.  *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 223 (2024); *see Hamilton v. Lanning*, 560 U.S. 505, 517 (2010).  To be sure, bankruptcy courts did create a "judge-made doctrine" that allowed them to subordinate a creditor's claim to that of other creditors when the equities required that result.  *United States v. Noland*, 517 U.S. 535, 538 (1996); *see, e.g.*, *Pepper v. Litton*, 308 U.S. 295, 304–11 (1939).  But Congress codified this practice of "equitable subordination" in the Bankruptcy Act of 1978.  11 U.S.C. § 510(c)(1); *see Noland*, 517 U.S. at 539–40.  And the practice historically required proof that a creditor had engaged in some sort of *inequitable* conduct.  *See In re Mobile Steel Co.*, 563 F.2d 692, 698–702 (5th Cir. 1977); *see also Harrington*, 603 U.S. at 225 n.7; *AutoStyle*, 269 F.3d at 744.  Recharacterization does not demand this element.  So the courts permitting recharacterization have never tried to ground it in the history of equitable subordination or in the statute that permits that subordination today.  *See Dornier*, 453 F.3d at 232; *SubMicron*, 432 F.3d at 454–55; *AutoStyle*, 269 F.3d at 748–49.  Like the doctrine of third-party releases, then, the doctrine of recharacterization appears to be a recent phenomenon.  *See Harrington*, 603 U.S. at 223–24.

*Third*, rather than ground recharacterization in express text or history, the courts authorizing this practice have relied on a catch-all provision in the Bankruptcy Code: 11 U.S.C. § 105(a).  *See Alternate Fuels*, 789 F.3d at 1145–46; *Dornier*, 453 F.3d at 231; *SubMicron*, 432 F.3d at 454 & n.6; *AutoStyle*, 269 F.3d at 748.  This subsection permits a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out" other

provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Yet our reliance on § 105(a) in this recharacterization context suffers from the same problem as our (now-overruled) reliance on that provision when we allowed bankruptcy courts to issue third-party releases of liability to non-debtors. *See In re Dow Corning Corp.*, 280 F.3d 648, 656–58 (6th Cir. 2002), *overruled by Harrington*, 603 U.S. 204. As *Harrington* explained, § 105(a) permits bankruptcy courts only to *carry out* powers "expressly conferred elsewhere in the code"; it does not give them independent substantive powers. 603 U.S. at 216 n.2. But *AutoStyle* and the other courts on this side of the split do not identify *another* provision that gives bankruptcy courts the power to recharacterize debt as equity. And § 105(a) cannot alone justify that practice. *See In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004).

*Fourth*, we borrowed our 11-factor recharacterization test from a tax case. *See AutoStyle*, 269 F.3d at 748–49 & n.12 (discussing *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986)). We thus may have overlooked an important difference between the bankruptcy and tax contexts. The Supreme Court has long held that "state-law definitions generally [are] not controlling in [the] federal tax context." *PPL Corp. v. Comm'r*, 569 U.S. 329, 335 (2013) (discussing *Heiner v. Mellon*, 304 U.S. 271, 279 & n.7 (1938)); *see Drye v. United States*, 528 U.S. 49, 58 (1999). In other words, the Court has read the Tax Code to care about the substance of "an interest or right created by" state law—"no matter what name is given to the interest or right by [that] state law." *Morgan v. Comm'r*, 309 U.S. 78, 81 (1940). So when the Tax Code uses the word "debt" (as in the provision allowing companies to take a deduction for bad debts, 26 U.S.C. § 166(a)), federal (not state) standards determine whether a state-law loan created a tax debt. *See Roth Steel*, 800 F.2d at 629–30. Indeed, the Tax Code expressly recognizes that the federal government will decide whether to treat "an interest in a corporation" "as stock or indebtedness[.]" 26 U.S.C. § 385(a). Yet the Supreme Court has not extended the same principles to the Bankruptcy Code. To the contrary, it has held that state law controls when deciding whether a creditor has a right to payment from a debtor. *Travelers*, 549 U.S. at 450–51. And there is no equivalent bankruptcy provision to 26 U.S.C. § 385(a). In short, federal tax law and precedent seem to allow for recharacterization in a way that federal bankruptcy law and precedent do not.

In this case, Bay Bridge Exports, LLC, suggests that *Travelers* overruled *AutoStyle* and gives us the right to depart from that decision in favor of a state-law approach to recharacterization. The Tenth Circuit has rejected this broad view of *Travelers* because the decision did not address recharacterization. *See Alternate Fuels*, 789 F.3d at 1146–49. I also find Bay Bridge's claim debatable. And our resolution of this appeal on evidentiary grounds makes it unnecessary for us to consider *AutoStyle*'s continued vitality at this time. Besides, the entrenched circuit conflict on this question shows that only the Supreme Court can bring uniformity to this area. And the millions of dollars at stake in this case demonstrate the question's importance.